IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

SYNDICATES 1183, 1036, and 2007,
CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON subscribing to
Charterer's Legal Liability Policy
Number GU300630J,

        Plaintiff,

   vs.

FURIE OPERATING ALASKA, LLC,
*et al.*,

        Defendants.

IN ADMIRALTY

Case No. 3:21-cv-00252-JMK

**ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT**

Before the Court at Dockets 58, 60, and 61 are motions for summary
judgment by Cook Inlet Spill Prevention & Response, Inc. and CISPRI Services, LLC
(collectively, "CISPRI"), Gemini Insurance Company ("Gemini"), and Syndicates 1183,
1036, and 2007, Certain Underwriters at Lloyd's, London ("Underwriters"). The motions
are each fully briefed.[1] Oral argument was requested by Gemini, but the Court deems it
unnecessary to its decision.[2]

## I.     BACKGROUND

---

[1] *See* Dockets 64–74.
[2] *See* D. Alaska L. Civ. R. 7.1(f).

This order resolves a dispute over insurance coverage for an accident caused by a defective mooring device. The facts of this case are straightforward and undisputed. Defendant Furie Operating Alaska, LLC ("Furie") owned and operated a natural gas extraction platform ("the Platform") in the Cook Inlet.[3] To transport workers and supplies to and from the Platform, Furie entered into a contract (the "Time Charter") with CISPRI to charter vessels on an as-needed basis.[4] Furie's gas extraction business, including the chartering of vessels to and from the Platform, was insured by three separate contracts relevant to this matter. Two policies from Gemini provide general liability coverage for the risks associated with operating the Platform: (1) the Energy Commercial General Liability Policy No. JGH2002114 ("Primary Policy"), with a limit of $1,000,000 per occurrence, and (2) the Energy Commercial Umbrella Liability Policy No. JUH2001888 ("Umbrella Policy"), with a limit of $10,000,000 per occurrence.[5] To cover Furie's risks associated with chartering vessels to service the Platform, Underwriters issued Furie the Charterer Legal Liability Policy No. B0702 GU300630j ("Charterer's Policy"), with a limit of $10,000,000 per occurrence.[6]

On January 8, 2016, the PERSEVERANCE, a vessel owned by CISPRI and chartered by Furie, was transporting supplies to the Platform. The crew attempted to secure the vessel to the platform using the Platform's mooring device (the "Mooring Apparatus"),

---

[3] Docket 27-4 at 2.

[4] The Time Charter consists of the "CISPRI Services Uniform Time Charter Party for Off-Shore Supply and Support Services" together with certain specified portions of a "Spot Charter Agreement" and of a "PERSEVERANCE Spot Charter Agreement." *Id*. at 5; *see also* Docket 60-3 (Time Charter Party).

[5] *See generally* Docket 35-4 (Primary Policy); Docket 35-5 (Umbrella Policy).

[6] *See generally* Docket 27-2.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*          Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                              Page 2

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 2 of 33

which included a wire rope sling. The rope parted under tension, snapping back and striking E.H., a deckhand on the PERSEVERANCE. The injuries left E.H. permanently disabled.[7] All three insurance policies were in effect at the time of the accident.[8]

As E.H.'s employer, CISPRI paid approximately $1.4 million in benefits to E.H. before ultimately settling his personal injury claim.[9] In June 2018, CISPRI asserted claims against Furie for

> (1) breach of contract under the Time Charter for failure to provide the vessel with a safe berth and for failure to provide appropriate operational plans and documents; (2) contractual indemnity under the Time Charter; (3) contribution for settling E.H.'s claims, on the basis that Furie was negligent in the design and operation of its mooring system.[10]

CISPRI demanded arbitration pursuant to the Time Charter.[11] The Final Arbitration Award was entered on August 9, 2021 (the "Award"). In a detailed decision, the Arbitrator reached several relevant findings of fact and conclusions of law:

- The Platform was attached to the seabed and was not a vessel.[12]

- The maneuvering and movement of the vessel in relation to the Platform was not reckless, out of the ordinary, unusual, or unexpected for a vessel using a Mooring Apparatus,[13] and the evidence indicates this "was a routine and unremarkable operation to hook up to the Mooring Apparatus."[14]

---

[7] Docket 27-4 at 2.

[8] *See* Docket 35-4; Docket 35-5; Docket 27-2.

[9] Docket 27-4 at 2, 20.

[10] Docket 58 at 9.

[11] *Id.* (citing Docket 27-4 at 3). On August 9, 2019, Furie filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware, which automatically stayed the arbitration proceedings. Docket 27-4 at 4. The Bankruptcy Court lifted the stay on June 11, 2020, for the limited purpose of allowing CISPRI to arbitrate its claims against Furie and collect any award from its insurance coverage. *See id.*; Docket 27-3 at 2 (Consent Order).

[12] Docket 27-4 at 2.

[13] *Id.* at 27.

[14] *Id.* at 29.

- The vessel's captain, and by extension CISPRI, was negligent and proximately caused E.H.'s injuries. The captain was negligent when he:

  o Failed to establish an arrangement by which he would know those on the foredeck were out of harm's way before putting tension on the wire;

  o Failed to carry out an adequate Job Safety Analysis; and

  o Neither knew nor attempted to confirm that those on the foredeck were out of harm's way before putting tension on the wire.[15]

- Furie was negligent and proximately caused E.H.'s injuries when it:

  o Installed an "*ad hoc* make-do solution rather than a designed/engineered connection to the Padeye," which risked an undesirable bending force in the wire rope sling and "may have contributed to the parting of the Wire Rope Sling";[16]

  o Used the Mooring Apparatus, including the wire rope sling, which Furie "should have known was unsafe for the use to which Furie put it to hold the Vessel"[17];

  o Installed and used a "Mooring Apparatus without leeway/margin of safety for the range of usual and expected variations of vessel movement during mooring"[18];

  o Failed to know "what vessels (vessel tonnage/size) in what circumstances (state of tide/current, wind force/direction, etc.) it was safe to permit them to use its Mooring Apparatus," and therefore failed to provide guidance to Platform employees "concerning when to/when to not use the Mooring Apparatus premised upon margins for safe use."[19]

- Furie did not breach the Time Charter provision to "exercise due diligence to direct the vessel to safe berths and safe locations, recognizing the risks inherent with vessel operations in the Cook Inlet and surrounding areas . . . ." because:

---

[15] *Id*. at 28.

[16] *Id*.

[17] *Id*.

[18] *Id*. at 29.

[19] *Id*.

o The fact that the Mooring Apparatus was unsafe is different than "the location [being] unsafe"; and

o The Platform was not a "berth."[20]

The Arbitrator apportioned sixty-five percent of fault to Furie and thirty-five percent of fault to CISPRI, resulting in a total award to CISPRI of approximately $8.1 million plus interest.[21]

Both Gemini and Underwriters initially declined to pay any amount of the Award. On November 17, 2021, Underwriters filed this suit seeking a declaratory judgment that the Charterer's Policy did not provide coverage for the accident.[22] On November 30, 2021, in a separate action, this Court confirmed the Award and a judgment was entered against Furie for the total amount of $8,237,479.81, including pre-judgment interest, attorney fees, and costs.[23] In March 2022, Gemini tendered the full amount of its Primary Policy ($1,000,000) plus interest, conditioned on CISPRI's agreement that Gemini did not waive its argument that the Umbrella Policy's "Watercraft Exclusion" applied to this accident.[24] CISPRI then asserted a counterclaim against Underwriters and a crossclaim against Gemini alleging that either or both the Charterer's Policy and the Umbrella Policy provides coverage.[25] CISPRI also asserted a claim that Gemini is liable for outstanding attorney's fees pursuant to Alaska Civil Rule 82 ("Rule 82").[26] Gemini filed its own

---

[20] *Id*. at 30.
[21] *See id*. at 32; Docket 59-5 at 1.
[22] Docket 1; Docket 27 (Second Amended Complaint).
[23] Docket 59-5.
[24] Docket 59-6 at 2.
[25] Docket 36.
[26] *Id*. at 25–26.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*          Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                Page 5

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 5 of 33

counterclaim against Underwriters seeking a declaration that the Charterer's Policy provides coverage and that the Umbrella Policy was not triggered and the accident is excluded from coverage.[27]

CISPRI, Gemini, and Underwriters now move the Court for a summary ruling regarding coverage under the Charterer's Policy and the Umbrella Policy. CISPRI also moves the Court for summary judgment on its claim against Gemini for attorney's fees under Rule 82.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[28] A material fact is one that might allow a reasonable jury to return a verdict for the nonmoving party.[29] A court's function on summary judgment is not to weigh evidence or make credibility determinations, but rather, to determine if there are genuine issues for trial.[30]

The moving party has the burden of demonstrating that there is no genuine dispute as to any material fact.[31] If the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[32] The nonmoving party's burden "is not a light one."[33] If the evidence provided by the nonmoving party is "merely colorable" or "not significantly probative," then summary

---

[27] Docket 35.
[28] Fed. R. Civ. P. 56(a).
[29] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[30] *Id.* at 249.
[31] *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016).
[32] *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).
[33] *Id.*

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                    Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                        Page 6

Case 3:21-cv-00252-JMK    Document 76    Filed 03/31/23    Page 6 of 33

judgment is appropriate.[34]  Further, the nonmoving party cannot rely upon conclusory allegations or denials to create a triable issue; it must set forth specific facts that "require a jury or judge resolve the parties' differing versions of the truth at trial."[35]  Still, all evidence presented by the nonmoving party must be believed for purposes of summary judgment and all justifiable inferences are to be drawn in its favor.[36]

## III.  DISCUSSION

Before the Court are two distinct issues: (1) which insurance policy, if any, provides coverage for the judgment obtained by CISPRI as a result of the accident; (2) whether Gemini's tender of the policy limits on the Primary Policy requires Gemini to pay Rule 82 attorney's fees based on the amount of the entire judgment.  The Court resolves the issue of coverage first.

### A.  The Charterer's Policy Does Not Provide Coverage Because Furie's Liability Does Not Arise Out of Its Activities as a Charterer

The Court first discusses the law applicable to the Charterer's Policy and interprets the scope of coverage under the Charterer's Policy before analyzing whether said coverage is triggered by the accident.

#### 1.  Applicable law

As a preliminary matter, the Court applies New York law when interpreting the Charterer's Policy.  The Charterer's Policy contains a choice of law provision, which

---

[34] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).
[35] *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).
[36] *Anderson*, 477 U.S. at 255.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                     Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                          Page 7

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 7 of 33

provides that disputes relating to the policy shall be governed by New York law.[37] "In the absence of a contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles . . . But where the parties specify in their contractual agreement which law will apply, admiralty courts will generally give effect to that choice."[38] Pursuant to the Charterer's Policy's choice of law provision, the parties agree that New York law should apply, and the Court sees no reason to deviate from that agreement.[39]

Under New York law, contractual interpretation is a question of law "unless there is ambiguity in the terminology used in the instrument and resolution of that ambiguity depends upon extrinsic evidence."[40] "Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage."[41] In determining coverage, New York courts "first look to the language of the policy . . . constru[ing] the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect."[42] "If an ambiguity exists, the insurer bears the burden of establishing that the construction it advances is not only reasonable, but also that it is the only fair construction . . . viewed

---

[37] Docket 27-2 at 3, 26.

[38] *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 916 (9th Cir. 2003) (quoting *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1296–97 (9th Cir. 1997)).

[39] *See id*. at 917 (explaining when a choice of law provision should not apply).

[40] *Frey v. Aetna Life & Cas.*, 633 N.Y.S.2d 880, 882 (1995) (emphasis omitted).

[41] *Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687, 690 (N.Y. Ct. App. 2002).

[42] *Id*. at 693 (internal citations and quotation omitted).

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*  Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment  Page 8

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 8 of 33

through the eyes of the average [person] on the street."[43] Overall, "policies of insurance, drawn as they ordinarily are by the insurer, are to be liberally construed in favor of the insured" and exclusions from coverage are construed strictly and narrowly.[44]

2. *The Charterer's Policy is a limited policy that provides coverage for "charterers' risks"*

Furie purchased the Charterer's Policy to insure its activities chartering vessels to and from the Platform.[45] The Charterer's Policy includes the following statement of coverage:

**1. COVERAGE**

Subject to the conditions, exclusions, warranties, definitions and limitations of this insurance underwriters shall indemnify the Assured up to a limit of *as per Policy Declarations* any one loss or series of losses arising out of an Accident all coverages combined in respect of:

(a) their legal and/or contractual liabilities to third parties, owners and/or disponent owners of the Chartered Vessel which are covered in the United Kingdom Mutual Assurance Association (Bermuda) Ltd. standard form of certificate and/or under their club rules **for charterers' risks** published and in effect at the inception of this insurance, but subject always to the limit of this insurance and further, Underwriters retain all rights reserved by the Association in the said certificate and/or their club rules.[46]

The Charterer's Policy therefore incorporates the United Kingdom Mutual Assurance Association (Bermuda) Ltd. Club rules ("Club Rules") to the extent they cover "charterers'

---

[43] *Nicastro v. N.Y. Cent. Mut. Fire Ins. Co.*, 50 N.Y.S.3d 736, 738 (2017) (quoting *Harrington v. Amica Mut. Ins. Co.*, 645 N.Y.S.2d 221, 224 (1996)).

[44] *Vermont Mut. Ins. Grp. v. LePore*, 179 N.Y.S.3d 479, 481–82 (2022) (quoting *Miller v. Cont'l Ins. Co.*, 389 N.Y.S.2d 565, 567 (1976)).

[45] *See generally* Docket 27-2.

[46] *Id*. at 19 (emphasis added).

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                    Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                          Page 9

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 9 of 33

risks."[47]  Relevant here, Club Rule 2 Section 2 provides coverage for "[i]njury and death

of seamen":

> Liability to pay damages or compensation for personal injury or death of any seaman, and hospital, medical, funeral and other expenses necessarily incurred in relation to such injury or death, including expenses of repatriating the seaman and sending abroad a substitute to replace him.
> PROVIDED ALWAYS that:
> Where the liability arises or the costs or expenses are incurred under the terms of a crew agreement or other contract of service or employment and would not have arisen but for those terms, that liability is not covered by the Association unless and to the extent that those terms shall have been previously approved by the Managers in writing.[48]

The Club Rules includes an Addendum for Charterers that sets out "Charterers' Liability

in Respect of Risks Set Out in Rule 2":

> ### A. Risks Covered
>
> This insurance covers the liability of the above-name Member in his capacity as charterer in respect of risks set out in Rule 2 and includes, pursuant to Rule 4 Section 1(A), the liability of the charterer to indemnify the owner or disponent owner in respect of such risks, to the extent that they arise out of operations or activities ordinarily carried on by, or ordinarily at the risk and responsibility of, a charterer.[49]

The provision references Club Rule 4 Section 1(A), which states that:

> ### Special Cover for Charterers, Specialist Operations, Passenger Ships, and TT Risks
>
> Without prejudice to the generality of Rule 3, an Owner may be insured against such of the risks set out below as may be appropriate to his interest in an entered ship or to his operations as an Owner, but only by special agreement in writing with the Managers and upon such terms and conditions as the Managers may require.

---

[47] *See id.*
[48] Docket 35-7 at 148.
[49] *Id.* at 253.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*      Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment      Page 10

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 10 of 33

**Section 1**
**Charterers**

For the purpose of this section, a 'charterer' shall mean a charterer other than a demise or bareboat charterer. Where the entry of a ship in the Association is in the name of or on behalf of a charterer, the following liabilities, losses, costs and expenses may be covered on such terms and conditions as may be agreed by the Managers in writing:

A. Liability of the charterer, together with costs and expenses incidental thereto, to indemnify the owner or disponent owner of the entered ship in respect of the risks set out in Rule 2.[50]

In order to provide abbreviated coverage "for charterers' risks," the Charterer's Policy incorporates, and is constrained by, the Addendum for Charterers. This follows from both the plain language of the contract and, as the Underwriters note, makes intuitive sense: the Gemini Primary and Umbrella Policies provide general liability coverage only for Furie's Platform operations, leaving a gap in coverage for its activities as charterer. The Charterer's Policy fills that gap.[51] Thus, the policy covers Furie's liability for E.H.'s personal injury damages "to the extent that they arise out of operations or activities ordinarily carried on by, or ordinarily at the risk and responsibility of, a charterer."[52]

Underwriters and CISPRI agree on this interpretation. Gemini, however, advances a much broader reading of the Charterer's Policy wherein the policy covers *any* personal injury of a seaman aboard a chartered vessel, regardless of the accident's relationship to the insured's activities as a charterer. Gemini argues that the Addendum

---

[50] *Id.* at 167.
[51] As CISPRI notes, an insurance broker obtained all policies for Furie in order to get comprehensive coverage. *See* Docket 59-1; Docket 59-2; Docket 59-3.
[52] Docket 35-7 at 253.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*
Order Re Motions for Summary Judgment
Case No. 3:21-cv-00252-JMK
Page 11

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 11 of 33

for Charterers and Club Rule 4 cannot limit Rule 2's personal injury coverage to charterer's risks because "there is no written agreement between Furie and the 'Managers' for supplemental coverage," citing Rule 4's language that "an Owner may be insured against such of the risks set out below as may be appropriate to his interest in an entered ship . . . but only by special agreement in writing with the Managers and upon such terms and conditions as the Managers may require."[53]  This argument would hold water if the Charterer's Policy wholesale incorporated the Club Rules, which provide broad protection and indemnity coverage to a vessel owner.[54]  In that situation, pursuant to Rule 4, the owner of a vessel can opt for supplemental coverage for its activities as a charterer if agreed to in writing.  Here, by contrast, the language of the Charterer's Policy—in accordance with its purpose to insure Furie as a charterer, not a vessel owner—explicitly limits incorporation of the Club Rules "for charterers' risks."  Therefore, an ordinary reading of the Charterer's Policy covers only those risks associated with Furie's activities as a charterer.  Gemini's interpretation ignores this crucial language, incorrectly treating the Charterer's Policy as a general liability insurance policy for a vessel owner.

Perhaps acknowledging its error, Gemini's reply contains a new argument that the Club Rules defines an "Owner" as including a "charterer," and therefore, "[t]he specific Charterer Addendum includes rules for additional charterer's risks and supplemental coverage, but those are not the only charterer's risks contemplated in the

---

[53]  Docket 60 at 23–26.

[54]  Indeed, this appears to be Gemini's understanding of the Charterer's Policy. *See* Docket 73 at 5 n.2 ("The Lloyd's Policy incorporates, without any conditions, limitations, or exclusions, the 300+ page Club Rules with over 44 rules and a slew of addendums.").

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*          Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                              Page 12
Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 12 of 33

Club Rules."[55]  However, the definition of "Owner" in the Club Rules does not, as Gemini posits, merge the roles of vessel owner and charterer; rather, it contemplates that the Owner may *also be* a charterer pursuant to the Club Rules.  To read the Club Rules and the Charterer's Policy as eliminating the distinction between charterer and owner disregards the plain language of both contracts, the clear purpose of the Charterer's Policy, and established maritime industry standards.[56]  The Court reject's Gemini's interpretation and finds that the Charterer's Policy covers Furie's liability for E.H.'s personal injury only to the extent that the injury arose out of Furie's activities as a charterer.

3.   *The Charterer's Policy does not cover Furie's liability for E.H.'s injuries because Furie was not negligent in its capacity as a charterer*

CISPRI and Underwriters agree that the Charterer's Policy only covers Furie's risks as charterer, but they disagree about whether E.H.'s injuries arose from those risks.  Underwriters argue that the Award forecloses coverage under the Charterer's Policy because the Arbitrator found that Furie did not breach its duty as charterer.  CISPRI concurs that the Arbitrator's findings are binding upon this Court.  However, it argues that those findings are not so exact as to prevent coverage.

---

[55]  Docket 73 at 6.

[56]  *See, e.g., Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 791–92 (5th Cir. 1990) (differentiating between a party's legal obligations and liabilities as a charterer, employer, and platform owner and noting that those duties are "separately owed and do not affect each other"); *D.C. Chemical Co. Ltd. v. M/T St/ Petri*, 654 F. Supp. 2d 574, 578 (S.D. Tex. 2009) (collecting cases); *Harris v. S.P. Shipping Co., Ltd.*, 818 F. Supp. 149, 152 (E.D. Va. 1993) ("Common sense dictates that the time charterer should be liable only for those injuries caused either by its direct negligence or for which it specifically agreed to bear responsibility.").

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                    Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                           Page 13
Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 13 of 33

The Court agrees with the parties that the Award is binding. The Arbitrator found Furie was negligent in "its use of a Mooring Apparatus, including Wire Rope Sling, which Furie should have known was unsafe for the use to which Furie put it to hold the Vessel."[57] Specifically, the Arbitrator found that Furie installed and used a Mooring Apparatus "without leeway/margin of safety for the range of usual and expected variations of vessel movement during mooring," and "Furie did not even understand that it was doing so because it did not have engineering drawing/s or calculations/information prepared by an engineer/naval architect . . . for which the Mooring Apparatus would be safe to use."[58] Because Furie designed an "ad hoc" apparatus that failed to incorporate adequate safety margins, the Arbitrator ruled that

> Furie was negligent in not knowing for what vessels (vessel tonnage/size) in what circumstances (state of tide/current, wind force/direction, etc.) it was safe to permit them to use its Mooring Apparatus. That negligence put Furie in the position of negligently failing to provide guidance to those on the Platform concerning when to/when to not use the Mooring Apparatus premised upon margins for safe use. In result those on Furie's Platform did not know the unsafe situation in which they might put vessels using the Mooring Apparatus, including the Vessel[.]
>
> That the Mooring Apparatus and its Wire Rope Sling failed in the circumstances of what the evidence indicates was a routine and unremarkable operation to hook up to the Mooring Apparatus proves the failure of Furie to have an appropriate margin of safety as part of its providing its Mooring Apparatus for use by vessels.
>
> The negligence of Furie was a proximate cause of the injuries to EH.[59]

---

[57] Docket 27-4 at 28.

[58] *Id*. at 29.

[59] *Id*.

The Arbitrator assigned Furie sixty-five percent fault for E.H.'s injuries because its negligence "created an unsafe situation with the consequence that a possibility existed at any time – depending upon the vessel and conditions (current, etc.) in which the Mooring Apparatus would be used - that the Mooring Apparatus/Wire Rope Sling would fail/part causing injury."[60]

CISPRI also raised a claim that Furie violated its obligation under the Time Charter to "exercise due diligence to direct the vessel to safe berths and safe locations recognizing risks inherent in vessel operations in Cook Inlet and surrounding areas. . . ."[61] The Arbitrator declined to find Furie breached this (or any) duty under the Time Charter. First, there was no breach concerning a "safe location" because the Mooring Apparatus being unsafe is different than the location of the Platform being unsafe.[62] Second, the "safe berths" provision is not implicated because the Platform was not a "berth" as that term is used in the provision.[63] Based on the Arbitrator's conclusions, Furie's liability results entirely from its Platform operations, not its activities as a charterer. Because the Platform-based negligence is unrelated to Furie's obligations as a charterer, the Charterer's Policy is not implicated.

CISPRI argues that the Award does not support "such an absolute distinction" between Furie's role as charterer and as Platform owner.[64] CISPRI argues that

---

[60] *Id*. at 32.
[61] *Id*. at 30.
[62] *Id*.
[63] *Id*.
[64] Docket 65 at 3.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                    Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                        Page 15
Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 15 of 33

Furie chartered the vessel to an "unsafe situation" at the Platform, which resulted in E.H.'s injury. As charterer, Furie "exercised control over the vessel by directing the vessel to its platform (by offering the mooring apparatus) and controlling the negligently designed and constructed mooring apparatus."[65] The Arbitrator found that Furie was negligent in allowing the vessel to use the unsafe Mooring Apparatus. Building on this finding, CISPRI argues that "Furie platform personnel controlled the Mooring Apparatus and lowered it to the Vessel crew"; thus, "[b]y the nature of the platform operator's action, [Furie] exercised control over the Vessel's movement related to cargo operations and caused the injury to E.H."[66] CISPRI argues this is sufficient to trigger liability under the Charterer Policy because "statements of coverage are broadly construed."[67]

CISPRI acknowledges that Furie did not breach the Time Charter, but notes that Arbitrator was determining liability, not analyzing insurance coverage.[68] While true, the distinction is irrelevant; this Court is bound to the Arbitrator's factual findings regarding Furie's liability for the damages for which CISPRI seeks coverage. To find Furie liable because it directed the vessel to the Mooring Apparatus would contradict the Arbitrator's findings that Furie, as charterer, exercised due diligence in directing the vessel

---

[65] Docket 58 at 26.

[66] Docket 65 at 3–4.

[67] *Id.* at 4.

[68] Docket 58 at 27 ("While a time charterer's traditional sphere of control does not extend to providing a safe means of ingress and egress from the vessel, absent special circumstances, the fact that a vessel may owe a duty to a third party over a certain sphere of activity does not necessarily mean that this duty is exclusive.") (citing *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512 (5th Cir. 1996) *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009)).

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                    Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                              Page 16

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 16 of 33

to safe berths and safe locations.[69]  The Award concludes that Furie's only liability was due to its actions designing and using the Mooring Apparatus.[70]  CISPRI's argument that the Charterer's Policy covers E.H.'s injury because Furie negligently directed the vessel to the Mooring Apparatus cannot be reconciled with the Award's determination of liability.[71]

The Court also understands CISPRI as more generally asserting that the term "in its capacity as charterer" should be broadly construed to include Furie's actions controlling the Mooring Apparatus and employing the persons on the Platform who provided the inadequate Mooring Apparatus to the vessel.[72]  CISPRI frames Furie's act of offering the Mooring Apparatus to the PERSEVERANCE as part of a larger operation that "exercis[ed] control over the vessel."[73]  While the Court agrees that a charterer's duty may extend beyond directing the vessel to safe locations, the undersigned cannot find legal support for the idea that controlling or offering the Mooring Apparatus, even in relation to a chartered vessel, is an activity "ordinarily carried on by, or ordinarily at the risk and responsibility of, a charterer."  CISPRI acknowledges that courts differentiate between a party's liabilities as charterer, employer, and platform owner, and that charterers do not

---

[69]  *Compare* Docket 27-4 at 30 (finding that Furie did not breach the provision that Furie "shall exercise due diligence to direct the vessel to safe berths and safe locations") *with* Docket 65 at 4 (CISPRI stating that "[t]he question for the Court is whether Furie's negligent actions in directing the Vessel to the 'unsafe situation' at the platform, were also done in its capacity as charterer").

[70]  Docket 27-4 at 32.

[71]  *See also* Docket 70 at 9 (CISPRI arguing that "[n]owhere in the Award does the Arbitrator specifically call out Furie's act of chartering the vessel as causative of the incident. Even the Arbitrator's conclusions about CISPRI's comparative fault made no reference to the Vessel's status as a chartered vessel having a causative impact on the incident").

[72]  Docket 58 at 25–28.

[73]  *Id.* at 26.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                    Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                         Page 17
Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 17 of 33

assume operational control or responsibility for the vessel.[74] CISPRI also defines "traditional spheres of [a charterer's] activity" as including "choosing the vessel's cargo, route, and general mission, as well as the specific time in which vessel will perform its assignment."[75] CISPRI offers a single case that found a time charterer liable for injuries sustained by a platform worker who used the platform's rope swing to transfer from the chartered vessel.[76] In that case, *Hodgen v. Forest Oil Corp.*, the district court found the charterer (who was also the platform owner) liable because a platform employee, acting as the charterer's agent, ordered the vessel to the platform even though he "knew or should have known the seas were too rough to make a swing rope transfer safely on that particular morning."[77] Although the vessel owner was responsible for safe ingress and egress from the vessel, the Fifth Circuit held that the time charterer may also be liable if the accident "resulted in part from a decision, such as the timing of the ingress or egress, within the time charterer's control spheres."[78] Thus, the charterer was liable because the timing of the

---

[74] *Id.* at 21 (citing *Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 792 (5th Cir. 1990); *D.C. Chemical Co. Ltd. v. M/T St/ Petri*, 654 F. Supp. 2d 574, 578 (S.D. Tex. 2009); and *Harris v. S.P. Shipping Co., Ltd.*, 818 F. Supp. 149, 152 (E.D. Va. 1993)).

[75] *Id.* at 27 (citing *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512 (5th Cir. 1996) *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009)); *see also* Docket 65 at 4 ("A charterer controls and directs the vessel's destination and cargo.").

[76] Docket 58 at 27 (citing *Hodgen*, 87 F.3d at 1512). CISPRI also cites *N.Y. Marine & Gen. Ins. Co. v. Total Petroleum*, No. 94-CV-10024-BC, 1995 WL 930561 (E.D. Mich. Sept. 29, 1995). *Id.* at 26. In that case, the court found the platform owner was liable as a charterer only because it had settled claims against it that asserted charterer's liability. The district court specifically declined to rule on the merits of the claim, rendering it inapposite for this analysis. *See N.Y. Marine & Gen. Ins. Co*, 1995 WL 930561, at *4.

[77] 87 F.3d at 1521.

[78] *Id*. at 1520.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*          Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                      Page 18

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 18 of 33

mission was in its control; it chose to direct the vessel to the platform during dangerously rough conditions.

In *Hodgen*, the platform's rope swing was safe to use in normal conditions—it was the charterer's decision to direct the vessel to the platform in dangerously rough seas that caused injury. Here, the timing of the PERSEVERANCE's approach to the Platform and the conditions of the Cook Inlet were not causes of E.H.'s injury. The cause of the injury was the Platform's inadequate Mooring Apparatus, the design and use of which was not within a time charterer's control. While Furie controlled the Mooring Apparatus as the Platform operator, this fact does not somehow expand its spheres of control as a time charterer.[79] The Award supports this result, noting that directing a vessel to an unsafe Mooring Apparatus was not a breach of the duty to direct a vessel to a safe location, regardless of weather conditions.[80] Because the negligent design and use of a Mooring Apparatus is not within a charterer's control, *Hodgen* does not support CISPRI's position.

Underwriters point to the Fifth Circuit's holding in *Moore v. Phillips Petroleum,* wherein a charterer was not held liable for a worker's injuries when the platform's rope swing broke due to rot.[81] Unlike in *Hodgen*, the cause of the injury was a dangerous condition of the platform, not the timing of the charter. The Fifth Circuit found the platform owner was responsible for the rope's physical condition and should have

---

[79] *See also Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 791 (5th Cir. 1990) ("The fact that the defendant is also the plaintiff's employer means that the defendant owes the plaintiff duties both as an employer and as a time charterer. The two duties are separately owed and do not affect each other.").

[80] Docket 27-4 at 30.

[81] 912 F.2d at 791–92.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                    Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                                          Page 19

Case 3:21-cv-00252-JMK    Document 76    Filed 03/31/23    Page 19 of 33

known that the rope was unsafe for its intended purpose, just like Furie, as the Platform owner, was responsible for the defective Mooring Apparatus and failed to know the safe parameters for its use.[82]  The rope swing, like the Mooring Apparatus, was a means of transfer to the fixed platform, and so the Fifth Circuit reasoned that "[t]he responsibility for the hazards it presents falls either on the platform owner-employer or on the vessel owner or both but, in any event, outside of the traditional duties of a time charterer."[83]  It declined to find the platform owner liable as a charterer even though it directed the vessel to a platform with a rope swing that it knew or should have known was dangerous.[84]  *Moore* tracks the Arbitrator's findings that the vessel owner (CISPRI) and the Platform owner (Furie) were jointly liable for E.H.'s injuries.[85]  The fact that Furie was also the vessel's charterer does not enlarge its liability, even if Furie directed the PERSEVERANCE to a platform that it should have known to be unsafe.[86]

Because designing and operating a Mooring Apparatus was a risk Furie assumed as the Platform owner, not a charterer, the Charterer's Policy does not indemnify Furie for E.H.'s injuries that were caused by the defective equipment.

**B.    The Umbrella Policy's "Watercraft Exclusion" Does Not Defeat Coverage Because Furie's Liability Does Not Arise Out of Its Use of a Watercraft**

---

[82]  *See id*. at 792.
[83]  *Id*.
[84]  *Id*. at 791–92.
[85]  Docket 27-4 at 32.
[86]  *See Moore*, 912 F.2d at 791–792 (differentiating the duties of platform owner, time charterer, and vessel owner before concluding that "the foregoing discussion demonstrates that the traditional allocation of duties between employer/platform owner, time charterer, and vessel owner places liability for harm on the party that is most directly responsible for the dangerous condition that caused the harm").

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*     Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                        Page 20
Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 20 of 33

Having determined the Charterer's Policy does not provide coverage for the judgment against Furie, the Court turns to the Umbrella Policy. The parties appear to agree that the Umbrella Policy provides general liability coverage for Furie's gas extraction operations in the Cook Inlet. The parties' dispute centers around whether the Umbrella Policy's "Watercraft Exclusion" precludes coverage.[87]

### 1. Applicable law

Unlike the Charterer's Policy, the Umbrella Policy does not contain a choice of law provision. To determine choice of law in admiralty suits, district courts first determine whether there is an established, applicable rule under federal maritime law.[88] In the absence of "a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice," state law will control.[89] Here, there is no federal statute, judicially-established rule, or need for uniform practice concerning the interpretation of the interpretations of the Umbrella Policy's Watercraft Exclusion; therefore, state law controls. Both Gemini and CISPRI agree that Alaska law should control as Alaska is the state with "the most significant relationship to the transaction and the parties."[90]

---

[87] Gemini's argument in its Motion for Summary Judgment is that the Umbrella Policy has not been triggered because the Charterer's Policy provides coverage and is an underlying insurance that has not been exhausted. Docket 60 at 30–33. In its opposition to CISPRI's Motion for Summary Judgment, Gemini reiterates that the Charterer's Policy has not been exhausted, but in the alternative, argues that a genuine issue of material fact exists regarding the applicability of the watercraft exclusion. Docket 69 at 28–31.

[88] *Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc.*, 518 F.3d 645, 650 (9th Cir. 2008).

[89] *Id.* (quoting *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 510 (9th Cir. 1984)).

[90] *Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 674 (9th Cir. 1997) (citing Restatement (Second) of Conflict of Laws § 188(1) (1971)).

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*      Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment      Page 21

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 21 of 33

Under Alaska law, courts construe insurance contracts "so as to provide coverage which a layperson would have reasonably expected from a lay interpretation of the policy terms."[91] The objectively reasonable expectation of the insured will control "even if painstaking study of the policy provisions would have negated those expectations."[92] To guide interpretation of an insurance contract, Alaska courts consider "(1) the language of the disputed provisions in the policy, (2) other provisions in the policy, (3) extrinsic evidence, and (4) case law interpreting similar provisions."[93] The court narrowly construes any exclusions to coverage.[94]

   2.   *The Umbrella Policy provides coverage for E.H.'s injuries unless an exclusion applies*

The parties appear to agree that the Umbrella Policy provides general liability coverage for Furie's operations in the Cook Inlet. The Umbrella Policy is an excess insurance policy that follows the form of the Primary Policy, providing up to $10 million per occurrence:

### A. Coverage A – Excess Follow Form Liability Insurance

Subject to all of the terms and conditions applicable to Coverage A – Excess Follow Form Liability Insurance, **WE** will pay on behalf of the **INSURED**, those damages . . . covered by this policy in excess of the total applicable limits of **UNDERLYING INSURANCE**. With respect to Coverage A, the terms and conditions of **UNDERLYING INSURANCE** are made a part of this policy, except with respect to:

---

[91] *Downing v. Country Life Ins. Co.*, 473 P.3d 699, 704 (Alaska 2020) (quoting *U.S. Fire Ins. Co. v. Colver*, 600 P.2d 1, 3 (Alaska 1979)).

[92] *Id.* (quoting *Allstate Ins. Co. v. Teel*, 100 P.3d 2, 4 (Alaska 2004)).

[93] *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Houle*, 269 P.3d 654, 657–58 (Alaska 2011)).

[94] *Houle*, 269 P.3d at 658.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*          Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                              Page 22

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 22 of 33

1. Any contrary provision contained in this policy; or

2. Any provision in this policy for which a similar provision is not contained in **UNDERLYING INSURANCE**.

With respect to the exceptions stated above, nothing contained therein will serve to make this policy broader than the **UNDERLYING INSURANCE.**

If **UNDERLYING INSURANCE** does not apply to damages . . . for reasons other than exhaustion of applicable Limits Of Insurance by payment of **CLAIMS**, settlements, or judgments, then Coverage A does not apply to those damages . . .

B. **Coverage B – Umbrella Liability Insurance**

Subject to all of the terms and conditions applicable to Coverage B – Umbrella Liability Insurance, **WE** will pay on behalf of the **INSURED**, those damages the **INSURED** becomes legally obligated to pay by reason of liability imposed by law . . . because of **BODILY INJURY** . . . covered by this policy. **WE** will pay such damages in excess of the **SELF-INSURED RETENTION** specified on the Declarations Page or the amount payable by **OTHER INSURANCE**, whichever is greater.

Coverage B will not apply to any **PAYMENT OBLIGATION**, **CLAIM**, or **SUIT** for which insurance is afforded under **UNDERLYING INSURANCE** or would have been afforded except for the exhaustion of the limits of **UNDERLYING INSURANCE**.[95]

Thus, Furie must "use up or exhaust" any available underlying insurance before the Umbrella Policy is triggered.[96]  Gemini argues that because the Charterer's Policy—the underlying insurance—is sufficient to cover Furie's liability, the Umbrella Policy will never be triggered.[97]  However, as discussed above, the Charterer's Policy does not apply to E.H.'s injuries and therefore the Umbrella Policy is triggered.  Because the parties appear

---

[95] Docket 35-5 at 11.
[96] *See* Docket 69 at 26 (citing *Sidney v. Allstate Ins. Co.*, 187 P.3d 443, 448 (Alaska 2008)).
[97] Docket 60 at 30–32.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*　　　　　　　　　Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment　　　　　　　　　　　　　　　　Page 23
Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 23 of 33

to agree that the Umbrella Policy insures Furie's liability for E.H.'s injuries, E.H.'s injuries are covered under the Umbrella Policy unless they fall under the policy's Watercraft Exclusion.[98]

3.   *The Watercraft Exclusion does not apply because the legal cause of E.H.'s injuries was Furie's Platform-based negligence*

The Primary Policy, and thus Umbrella Policy, contains a Watercraft Exclusion which provides that the policy does not apply to

> **BODILY INJURY** or **PROPERTY DAMAGE** arising out of the ownership, maintenance, use, or entrustment to others of any Aircraft, **AUTO**, or Watercraft owned or operated by, rented by, chartered by, or loaned to any **INSURED**. Use includes operation and **LOADING OR UNLOADING**.
>
> This Exclusion applies even if the **CLAIMS** against any **INSURED** allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that **INSURED**, if the **OCCURRENCE** which caused the **BODILY INJURY** or **PROPERTY DAMAGE** involved the ownership, maintenance, use, or entrustment to others of any Aircraft, **AUTO**, or Watercraft that is owned or operated by, rented by, chartered by, or loaned to any **INSURED**.[99]

---

[98]   Docket 58 at 15–16; *but see* Docket 69 at 27–28 ("Additionally, CISPRI has failed to meet its burden to establish coverage. As a result, the Court should not declare coverage under Gemini's Umbrella Policy, regardless of the watercraft exclusion"). It is unclear whether Gemini argues that the Umbrella Policy does not establish coverage for E.H.'s injury beyond its analysis of the Watercraft Exclusion. Because Gemini does not raise or develop this argument, the issue is not before the Court. *See Howell v. Mun. of Anchorage*, --- F. Supp. 3d ---, 2022 WL 17736788 at *19 (D. Alaska 2022) (citing *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 974 (E.D. Cal. 2018) ("At summary judgment, a party can waive an argument . . . by failing to brief an issue."); *Witte v. Wis. Dept. of Corrs.*, 434 F.3d 1031, 1038 (7th Cir. 2006) ("By failing to raise [the argument] in his brief opposing summary judgment, he lost the opportunity to urge it in both the district court and this court."), *rev'd on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013)).

[99]   Docket 35-4 at 22.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*          Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                      Page 24

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 24 of 33

While "use" or "operation" is not further defined, the policy defines "loading or unloading" to mean the handling of property:

    a.  After it is moved from the place where it is accepted for movement into or onto an Aircraft, **AUTO**, or Watercraft;

    b.  While it is in or on an Aircraft, **AUTO**, or Watercraft; or

    c.  While it is being moved from an Aircraft, **AUTO**, or Watercraft to the place where it is finally delivered;

but **LOADING OR UNLOADING** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the Aircraft, **AUTO**, or Watercraft.[100]

The policy contains an "Offshore Worksite Endorsement" which specifically provides that production platforms are not considered watercraft,[101] and the parties agree that the PERSEVERANCE is a watercraft.

The question before the Court is whether E.H.'s injuries arose out of Furie's use of the PERSEVERANCE. CISPRI, consistent with its position that both the Charterer's Policy and the Umbrella Policy could provide coverage, argues that "there are multiple causes of E.H.'s injury in this case . . . [and] even though one of the causes is Furie's chartering of the vessel,"[102] this does not defeat coverage because "Furie's negligence in designing the platform, installing an inadequate mooring apparatus and operating the mooring apparatus . . . was the originating and dominant cause of the loss."[103] Gemini argues that a genuine issue of material fact exists as to whether the design and use of the Mooring Apparatus was the dominant cause of loss. In support, Gemini cites the

---

[100] *Id*. at 35.
[101] *Id*. at 51.
[102] Docket 58 at 23.
[103] *Id*. at 24 (citing Alaska Stat. § 21.36.096).

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*      Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment      Page 25
Case 3:21-cv-00252-JMK    Document 76    Filed 03/31/23    Page 25 of 33

Arbitrator's conclusion that "the basic negligence of Furie is its use of a Mooring Apparatus, including the Wire Rope Sling, which Furie should have known was unsafe for the use to which Furie put it to hold the Vessel" and reiterates CISPRI's arguments relating to the Charterer's Policy.[104]  In other words, Gemini argues, the Mooring Apparatus was inadequate for this *specific* vessel, and thus, the loss "stemmed almost exclusively from the use of this particular chartered watercraft."[105]  Gemini articulates Furie's "uses" of the watercraft that preclude coverage: (1) using the mooring device with the vessel, (2) exercising control over the vessel, and (3) directing the vessel to use the Mooring Apparatus.[106]  At minimum, Gemini argues, it is unresolved which cause of the accident—Furie's negligence as the Platform operator or its use of the vessel—was more dominant.

The Court's holding is simpler: because Furie's use of the vessel was not a legal cause E.H.'s injury, let alone a dominant one, the Watercraft Exclusion does not apply.  First, Gemini offers the term "use" in a colloquial sense, rather than as defined by the contract.  Under the Primary Policy, "use" of a watercraft includes its operation and the handling of property to and from the watercraft.[107]  As charterer, Furie did not operate the vessel, nor were goods being unloaded at the time of the accident.[108]  Second, the Award

---

[104]  Docket 69 at 30–31 (quoting Docket 61-5 at 29).
[105]  *Id*. at 31.
[106]  *Id*. at 30–31.
[107]  *See* Docket 35-4 at 22, 35.
[108]  *See* Docket 60-3 at 3 ("The entire operation, navigation and management of the vessel shall be in the exclusive control and command of the OWNER, its master, officers and crew."); Docket 60-2 (Spot Charter Agreement); *see also Marr Enters., Inc. v. Lewis Refrig. Co.*, 556 F.2d 951, 957 n.7 (9th Cir. 1977) ("In a time charter, the owner's personnel manage the vessel and he usually supplies the crew. Possession and control of the ship remain in the original owner. The charterer has only the temporary right to have his goods loaded and conveyed."); *D.C. Chem. Co.*

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*          Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment          Page 26

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 26 of 33

concludes that Furie's *only* liability for E.H.'s injuries arose from its negligent design and use of the Mooring Apparatus.[109] Incorporating the previous discussion regarding Furie's lack of negligence as a charterer,[110] the Court cannot find that Furie was liable for exercising control over the vessel or directing the vessel to the Mooring Apparatus. Further, that the Mooring Apparatus was inadequate for this specific vessel does not mean the vessel caused E.H.'s injury—it means the Mooring Apparatus was badly designed, and, as the Platform operator, Furie was negligent in not knowing its limitations.

Since the Charterer's Policy does not cover Furie's liability for E.H.'s injury, it makes intuitive sense that the Watercraft Exclusion is inapplicable. The Primary Policy does not cover Furie's activities chartering vessels to and from the platform, which is why Furie purchased the Charterer's Policy. The Primary Policy covers Furie's general risks as a Platform operator.[111] Here, E.H. was injured because of a defective piece of Platform equipment and the Platform employees' negligent use of that equipment. The chartered status of the vessel is entirely incidental to the accident and to Furie's liability—any vessel of that size risked snapping the wire rope. If the PERSEVERANCE was not under charter, Furie would clearly look to its general liability policy for coverage for its defective Mooring Apparatus. Its dual role as charterer does not diminish that insurance. Because

---

*Ltd. v. M/T ST. PETRI*, 654 F. Supp. 2d 574, 578 (S.D. Tex. 2009) (noting that time charterers do not have control over "the details of vessel operations").

[109] Docket 27-4 at 28 ("[T]he basic negligence of Furie is *its use* of a Mooring Apparatus, including the Wire Rope Sling, which Furie should have known was unsafe *for the use* to which Furie put it to hold the Vessel.") (emphasis added).

[110] *See supra* Section III(A)(3).

[111] *See* Docket 35-4 at 6 (identifying the insured as an "operator"), 10, 37 (defining "operator").

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                     Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                          Page 27

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 27 of 33

Furie's liability arose from its negligent platform operations, the Umbrella Policy provides coverage for E.H.'s injury and the Watercraft Exclusion does not apply.[112]

## C. CISPRI is Not Entitled to Attorney's Fees for Gemini's Tender of the Policy Limits of the Primary Policy

CISPRI moves for summary judgment on its claim against Gemini for failure to pay attorney's fees when it tendered the policy limits of the Primary Policy. On August 11, 2021, CISPRI presented the Award to Gemini.[113] Pursuant to the Award, CISPRI, as the prevailing party, was entitled to $321,950 in attorney's fees.[114] Gemini and Underwriters declined to pay, and the parties attempted mediation.[115] The parties could not reach a resolution. Underwriters filed the present Complaint on November 17, 2021, seeking a declaration that the Charterer's Policy did not cover Furie's liability for E.H.'s injuries.[116] The Award was reduced to a monetary judgment, which included an additional $3,000 attorney's fees for CISPRI's work related to the Petition for Confirmation of Arbitration Award.[117] The parties again attempted mediation. Gemini then offered to pay the Primary Policy limits plus interest "to take the primary policy coverage issue off the table."[118] Gemini's payment was conditioned on CISPRI's agreement that Gemini reserved its argument that the Watercraft Exclusion bars coverage under both the Primary

---

[112] Because the Court does not find that Furie's "use" of the vessel was a cause of E.H.'s injuries, it does not address the parties' arguments regarding the efficient proximate cause rule or Alaska Stat. § 21.36.096.

[113] Docket 71 ¶ 3.

[114] *See* Docket 27-4 at 33–34.

[115] *See* Docket 70 at 11.

[116] Docket 1.

[117] Docket 59-5 at 3.

[118] Docket 70 at 11.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*　　　　　　Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment　　　　　　　　　　　　　　Page 28

Case 3:21-cv-00252-JMK　Document 76　Filed 03/31/23　Page 28 of 33

and Umbrella Policies.[119]  The parties memorialized this agreement in a letter on March

12, 2022:

> [I]n an effort to partially resolve this Lawsuit and the underlying arbitration, Gemini will tender the $1M limit of the Gemini Primary Policy, plus supplemental interest. Gemini and CISPRI agree that the interest on the $1M Gemini Primary Policy is $180,390.58 through March 15, 2022.  Thus, the total amount Gemini will tender to CISPRI for satisfaction of the Gemini Primary Policy is $1,180,390.58.
>
> Gemini reserves the right to assert the applicability of the Watercraft Exclusion as incorporated into the Gemini Umbrella Policy.  CISPRI has agreed that it will not assert that Gemini has waived the Watercraft Exclusion in the Gemini Umbrella Policy as a result of Gemini's tender of the Gemini Primary Policy limits.  Gemini also reserves the right to recover from Lloyds any amount Gemini pays to CISPRI, which Lloyds should have in fact paid as the Lloyd's Policy is primary.[120]

Neither party discussed attorney's fees in connection with this agreement.[121]  Gemini

issued the payment shortly after the agreement was memorialized.[122]  After Gemini

tendered its payment, CISPRI's counsel became aware "that Alaska Civil Rule 82 would

apply in federal court."[123]  On March 18, CISPRI's counsel wrote to Gemini's counsel

"alerting them to the issue."[124]

---

[119]  *See id.* (stating that Gemini communicated its written offer concerning the Primary Policy on February 28, 2022, conditioned on CISPRI's agreement, and characterizing this discussion as "confidential written communications").

[120]  Docket 69-4 at 2.

[121]  *See* Docket 69 at 16–17; Docket 70 at 11.

[122]  Docket 69 at 16.

[123]  Docket 70 at 11; Docket 58 at 30 (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, No. 3:03-cv-00029-TMB, 2010 WL 11474830, at *2 (D. Alaska June 15, 2010) ("It is well settled in this circuit that '[a]n award of attorneys' fees incurred in a suit based upon state substantive law is generally governed by state law.'") (quoting *Champion Produce, Inc. v. Ruby Robinson, Co.*, 342 F.3d 1016, 1024–25 (9th Cir. 2003)) *aff'd in part and remanded*, 709 F.3d 872 (9th Cir. 2013), and *aff'd in part and remanded*, 738 F.3d 960 (9th Cir. 2013)).

[124]  Docket 70 at 12; Docket 71 ¶ 6.

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                                    Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                                          Page 29
Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 29 of 33

On April 5, 2022, Underwriters amended their Complaint to include the fact that Gemini tendered payment under the Primary Policy.[125]  On April 15, 2022, CISPRI filed its Answer in which it asserted a counterclaim against Underwriters and a crossclaim against Gemini.[126]  In addition to asserting that the Gemini policies provided coverage for the judgment, CISPRI brought a claim for attorney's fees based on Gemini's tender of the Primary Policy.  CISPRI alleges that the Primary Policy does not contain a notice that would otherwise limit Gemini's liability for attorney's fees,[127] and that "Gemini's payment of policy limits under its primary policy ($1,000,000) was not tendered with Alaska Civil Rule 82 attorney's fees."[128]  CISPRI seeks (1) attorney's fees based on the monetary judgment entered against Furie (rather than the Primary Policy's limit) and (2) for the attorney's fee award to be calculated as if this case were contested with a trial.[129]

Gemini counters that Rule 82 does not apply to this situation.[130]  In any event, Gemini argues, the parties' agreement regarding tender of the Primary Policy overrides Rule 82, or in the alternative, CISPRI waived its right to collect attorney's fees because its "neglect to insist upon the right [] results in prejudice to [Gemini]."[131]

The Court has serious doubts that CISPRI could recover attorney's fees for Gemini's tender of the Primary Policy based on the judgment against Furie or as calculated

---

[125]  Docket 27 ¶¶ 138–40.
[126]  Docket 28; Docket 36 (amended).
[127]  Docket 36 ¶ 227.
[128]  *Id.* ¶ 228.
[129]  *See* Alaska R. Civ. P. 82(b)(1) (setting schedule of attorney's fees based on posture of case and amount of award).
[130]  Docket 69 at 22–23, 25.
[131]  Docket 69 at 19 (quoting *Creekside Ltd. P'ship v. Alaska Hous. Fin. Corp.*, 482 P.3d 377, 385 (Alaska 2021)).

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                    Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                        Page 30

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 30 of 33

under Rule 82(b)(1).[132] Regardless, the Court concurs with Gemini that the parties'

agreement supersedes any fees to which CISPRI was otherwise entitled. Rule 82 provides

that, "except as otherwise provided by law or agreed to by the parties, the prevailing party

in a civil case shall be awarded attorney's fees calculated under this rule."[133] Here, the

parties negotiated the terms of Gemini's tender of the Primary Policy.[134] Per the parties'

agreement, "the total amount Gemini will tender to CISPRI for satisfaction of the Gemini

Primary Policy is $1,180,390.58," and in exchange, "CISPRI has agreed that it will not

assert that Gemini has waived the Watercraft Exclusion in the Gemini Umbrella Policy as

a result of Gemini's tender of the Gemini Primary Policy limits."[135] Underwriters then

amended their Complaint and CISPRI did not bring a claim under the Primary Policy.

Notably, here, Gemini did not offer to settle for "policy limits": the parties agreed on a

specific, "total" amount that included the policy's facial limit plus interest. The parties

---

[132] *See Holderness v. State Farm Fire & Cas. Co.*, 24 P.3d 1235, 1244–45 (Alaska 2001) (holding that trial court correctly denied a motion for Rule 82 attorney's fees based on arbitration damages because "Civil Rule 82 only applies to the costs of the action, not attorney's fees incurred in the conduct of the prior arbitration"); *Integrated Res. Equity Corp. v. Fairbanks N. Star Borough*, 799 P.2d 295, 300 (Alaska 1990) (vacating fee award predicated on the amount awarded at arbitration rather than the costs incurred in the present action). The caselaw CISPRI cites involves an insurer settling a claim brought directly against its insured as part of the insurer's duty to defend, not a declaratory judgment action to resolve coverage disputes. *See, e.g., State Farm Mut. Auto Ins. Co. v. Harrington*, 918 P.2d 1022, 1026 (Alaska 1996) ("The term 'policy limits' means other sums that are payable in addition to facial limits *if* any insurance company settles a claim *on behalf of its insured* under the policy.") (emphasis added); *Schultz v. Travelers Indem. Co.*, 754 P.2d 265, 267 (Alaska 1988) (holding that insurer was obligated to pay Rule 82 attorney's fees to plaintiff when settling plaintiff's claim against insured because, as part of the policy's duty to defend, the insurer agreed to pay unlimited court costs).

[133] Alaska R. Civ. P. 82(a); *see also Gamble v. Northstore P'ship*, 28 P.3d 286, 288 (Alaska 2001) (explaining that Rule 82 may be overridden by agreement).

[134] *See* Docket 70 at 11.

[135] Docket 69-4 at 2.

agreed that this would "satisfy" the Primary Policy such that it was exhausted. Thus, the written agreement between Gemini and CISPRI exhibits an objective expectation that Gemini would exchange a specific sum to resolve CISPRI's claim for coverage under the Primary Policy.[136]

CISPRI does not provide any evidence to suggest that it reasonably expected attorney's fees at the time of the agreement. In fact, CISPRI's counsel admits he did not believe he was entitled to attorney's fees until after the parties memorialized the agreement and Gemini tendered payment.[137] CISPRI argues that this delayed awareness proves that it did not waive Rule 82 fees because it did not intentionally relinquish a known right.[138] But because Rule 82 provides that parties may contract out of its provisions, the Court looks beyond the doctrine of waiver and instead to the parties' written agreement.[139] Evaluating the plain language of the agreement, the parties did not reasonably expect attorney's fees to be included in Gemini's tender of the Primary Policy. While the Court certainly does not think CISPRI was "sandbagging" Gemini,[140] counsel's belated understanding of Rule 82 cannot nullify or change the terms of the parties' explicit agreement.[141] CISPRI's claim regarding Rule 82 attorney's fees fails as a matter of law.

---

[136] *See Blair v. Fed. Ins. Co.*, 433 P.3d 1048, 1053–54 (Alaska 2018) (applying contract law principles to find that the parties' settlement for "policy limits" did not include Rule 82 fees).

[137] Docket 70 at 11–12.

[138] *Id*. at 12.

[139] *Cf. Creekside Ltd. P'ship v. Alaska House Fin. Corp.*, 482 P.3d 377, 385 (Alaska 2021) (affirming superior court's analysis of the parties' contracts, rather than under a theory of waiver, when the alleged right could be eliminated via contract).

[140] Docket 70 at 11.

[141] *See Blair*, 433 P.3d at 1054 ("The mutual assent requirement cannot be defeated by the unexpressed subjective intent of one of the parties; rather it must rest on an objective manifestation of mutual intent regarding the essential terms of the contract.") (quoting *Colton v. Colton*, 244

# IV.    CONCLUSION

Based on the preceding discussion, Underwriters' Motion for Summary Judgment at Docket 61 is **GRANTED**, Gemini's Motion for Summary Judgment at Docket 60 is **DENIED**, and CISPRI's Motion for Summary Judgment at Docket 58 is **GRANTED IN PART** and **DENIED IN PART** in accordance with this Order.

**IT IS FURTHER ORDERED** that the parties shall file a joint status report within fourteen (14) days of this Order identifying any remaining issues for litigation and a proposed schedule for resolving those issues.  If issues remain, the Court respectfully encourages the parties to consider mediation.  The status report should indicate whether the parties desire a judicial settlement conference, and if so, include a range of available dates.

**IT IS SO ORDERED** this 31st day of March, 2023, at Anchorage, Alaska.


_____
        */s/ Joshua M. Kindred*
          JOSHUA M. KINDRED
        United States District Judge

---

P.3d 1121, 1128 (Alaska 2010)); *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981) ("Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract").

*Syndicates 1183, 1036, and 2007, et al. v. Furie, et al.*                              Case No. 3:21-cv-00252-JMK
Order Re Motions for Summary Judgment                                                    Page 33

Case 3:21-cv-00252-JMK   Document 76   Filed 03/31/23   Page 33 of 33